# United States Court of Appeals
## For the First Circuit

Nos. 04-2281, 04-2282

GENERAL MOTORS CORPORATION,

Plaintiff, Appellant/Cross-Appellee,

v.

DARLING'S, d/b/a DARLING'S AUTO MALL,

Defendant, Appellee/Cross-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. George Z. Singal, U.S. District Judge]

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

James C. McGrath, with whom Daniel L. Goldberg, Bingham McCutchen LLP, Frederick J. Badger, Jr., Richardson, Whitman, Large & Badger, Lawrence S. Buonomo and General Motors Corporation, were on brief for appellant.
Judy A.S. Metcalf, with whom Laura Lee Klein and Eaton Peabody were on brief, for appellee.
Bruce C. Gerrity, Jeanne B. McHale and Preti, Flaherty, Beliveau, Pachios & Haley, LLC, on brief for amicus curiae Maine Auto Dealers Association, Inc.

April 14, 2006

**HOWARD**, <u>Circuit Judge</u>.  These cross-appeals are the latest episode in a thirty-year conflict between national motor vehicle manufacturers and their Maine-based dealers concerning the manufacturers' obligation to reimburse the dealers for repairs made to vehicles under warranty.  <u>See</u> <u>Alliance of Auto. Mfrs.</u> v. <u>Gwadosky</u>, 304 F. Supp. 2d 104, 106 (D. Me. 2004) (summarizing this "long, complex, and litigious history").  General Motors ("GM") brought this diversity lawsuit seeking a declaration of certain of its rights and obligations under the Maine warranty reimbursement statute, <u>see</u> Me. Rev. Stat. Ann. tit. 10, § 1176,[1] and Darling's, GM's authorized distributor in Maine, responded with several related counterclaims.

I.        **BACKGROUND**

        **A.        The Statutory Context**

        At the urging of Maine's motor vehicle dealers, the Maine legislature began regulating the manufacturer-dealer relationship in 1975.  <u>See</u> Me. Rev. Stat. Ann. tit. 10, § 1171 <u>et seq</u>. (the "Dealer Act"); <u>Alliance of Auto. Mfrs.</u> v. <u>Gwadosky</u>, 430 F.3d 30, 33 (1st Cir. 2005).  The original version of the warranty reimbursement provision required a motor vehicle manufacturer to "adequately and fairly compensate each of its motor vehicle dealers

---

        [1]We recently upheld the constitutionality of § 1176 against Commerce and Contracts Clause challenges brought by an association of manufacturers.  <u>See</u> <u>Alliance of Auto. Mfrs.</u> v. <u>Gwadosky</u>, 430 F.3d 30 (1st Cir. 2005).

for parts and labor." Me. Rev. Stat. Ann. tit. 10, § 1176 (1975). Following amendments in 1980 and 1991, the statute more specifically required manufacturers to reimburse for parts and labor "at the retail rate customarily charged" by each dealer for the same parts and labor provided to non-warranty customers. Me. Rev. Stat. Ann. tit. 10, § 1176 (1997).[2] Although the statute did not specify how a dealer's customary retail rate for parts should be established, it stated that a dealer's retail rates for <u>labor</u> are established by posting its labor rates in a conspicuous location within view of the dealer's service customers. <u>See</u> <u>id.</u>

---

[2]At the time this litigation was initiated in 2001, § 1176 provided in relevant part:

> If a motor vehicle [manufacturer] requires or permits a motor vehicle [dealer] to perform labor or provide parts in satisfaction of a warranty created by the [manufacturer], the [manufacturer] shall properly and promptly fulfill its warranty obligations . . . and . . . . shall reimburse the [dealer] for any parts so provided at the retail rate customarily charged by that [dealer] for the same parts when not provided in satisfaction of a warranty. Further, the [manufacturer] shall reimburse the [dealer] for any labor so performed at the retail rate customarily charged by that [dealer] for the same labor when not performed in satisfaction of a warranty; provided that the [dealer's] rate for labor not performed in satisfaction of a warranty is routinely posted in a place conspicuous to its service customer. . . . Any claim made by a [dealer] for compensation for parts provided or for reimbursement for labor performed in satisfaction of a warranty must be paid within 30 days of its approval. All the claims must be either approved or disapproved within 30 days of their receipt. When any such claim is disapproved, the [dealer] that submitted it must be notified in writing of its disapproval within that period, together with the specific reasons for its disapproval.

Following another amendment in 2003, a dealer may now establish its customary retail rate for parts by submitting to the manufacturer either 100 sequential or 60 days of non-warranty customer-paid service repair orders. See Me. Rev. Stat. Ann. tit. 10, § 1176 (2004). The average parts markup percentage for those repairs establishes the dealer's customary retail markup for parts. See id. The 2003 amendment also extends the period of time for a manufacturer to approve or disapprove a claim, from 30 days to 60 days after submission, extends the time a manufacturer has to pay a claim, from 30 days to 60 days after approval, limits the manufacturers' reimbursement obligation to only those claims submitted within 90 days of the performance of the warranty repair, and bars manufacturers from recovering the costs of reimbursing their Maine dealers at retail rates. See id.

**B.     GM's Nationwide Uniform Warranty Reimbursement System**

GM distributes its automobiles through a nationwide network of authorized dealers. Darling's has been a Maine-based authorized GM dealer since 1994, selling three lines of GM vehicles (Buick, Pontiac and GMC) under successive versions of the Dealer Sales and Service Agreement ("Dealer Agreement"), the most recent of which was executed in 2000. Pursuant to the Dealer Agreement, Darling's must perform warranty repairs on qualified vehicles and GM must reimburse Darling's for parts and labor in accordance with

the Service Policies and Procedures Manual ("Service Manual").[3] GM reimburses its North American dealers based on a uniform methodology that uses a fixed markup for the cost of parts (usually 40 percent), and the dealers' established hourly rates for labor, multiplied by GM's labor time guidelines, which provide the number of labor hours allotted for a specific repair.

GM processes warranty reimbursement clams through a nationwide computer system called the Warranty Information System ("WINS"). WINS, which allows dealers to submit claims electronically, was developed in the mid-1990s to standardize GM's warranty claims processing across all of its lines. Before WINS, a dealer which sold three different lines of GM vehicles, like Darling's, was required to submit separate reimbursement claims through three distinct processing systems. All of GM's dealers in the United States, Canada, Mexico and the Caribbean now use WINS. Annually, GM uses the system to pay approximately 48 million claims (including some non-warranty claims) worth over four billion dollars.

WINS requires each warranty reimbursement claim to include the dealer's repair order number, the date of service, the vehicle identification number ("VIN"), the applicable labor operation number, the failed part number, and the parts

---

[3]We refer to the Dealer Agreement and the Service Manual collectively as the "GM-Darling's Agreement."

-5-

reimbursement amount. Within five days of submission, WINS automatically reviews the claim to determine whether it is within certain basic parameters based on the information provided in the claim and any existing electronic records for the vehicle corresponding to the entered VIN.[4] If WINS finds an error in the claim, the dealer is notified electronically. If the claim passes the initial check, GM reimburses the dealer based on a uniform methodology. WINS calculates the maximum labor reimbursement by multiplying GM's time guidelines for the repair by the dealer's approved labor rate, which is usually an average of the rates a dealer has charged for all manner of repairs. It calculates the maximum parts reimbursement by multiplying the cost of the parts by the established parts markup rate for that dealer, which is usually 40 percent. As long as the total amount requested by the dealer does not exceed these ceilings, WINS automatically approves the claim and credits the dealer through an open account held jointly by GM and the dealer. Approximately 90 percent of all WINS claims are approved in this way and are paid within seven to ten days of the initial claim submission.

---

[4]Among other things, WINS checks that the vehicle is within warranty coverage, that the vehicle's characteristics match the reported repairs, and that the claim was submitted within 180 days after the repair date.

## C.    GM's Reimbursement of Warranty Claims in Maine

Because Maine's warranty reimbursement statute requires manufacturers to reimburse for parts and labor "at the retail rate customarily charged" by each dealer, Maine dealers may request warranty reimbursement for parts and labor using their own internal formulas, and not those specified by the manufacturers.  But, being an automated system, WINS has certain limitations that prevent it from processing claims that include variables that it was not programmed to handle.  For example, WINS cannot handle multiple parts markup rates for a single dealer.  Nor can it substitute GM's time guidelines with dealer-specific labor times.  Consequently, when a Maine dealer submits a claim that exceeds GM's uniform nationwide rate and includes such variables, WINS is unable to fully reimburse the dealer.  To accommodate Maine's dealers without completely abandoning WINS, GM devised a two-tiered reimbursement system whereby Maine dealers first submit a claim through WINS for reimbursement at GM's uniform rate, and then submit a supplemental claim to collect the difference between the WINS rate and the dealer's retail rate.

To verify the accuracy of supplemental claims, and to allow GM to cross-reference the supplemental claims with the initial WINS claims, GM requires that supplemental claims include the VIN and date of repair.  In addition, to verify the dealer's retail rate, GM requires information in the supplemental claim that

is not provided in the WINS submission: the dealer's various parts markup percentages, the retail labor hours charged by the dealer, and the method by which the labor time was calculated. This information allows GM to assess the basis of the dealer's claimed retail rate and to verify its accuracy by reviewing the dealer's actual non-warranty service records.

Maine dealers typically submit supplemental claims by e-mail or fax to the GM Area Service Manager ("ASM") assigned to each dealer's region. The ASM reviews the supplemental claim, verifies that the individual claims associated with the supplemental claim were previously submitted and paid by WINS, and determines whether the amount sought appears reasonable based on the information provided. Because GM prefers to manage its dealer reimbursements through WINS, if the supplemental claim is approved, the ASM directs the dealer to submit an "H-route" request -- a specially coded electronic claim -- for payment through WINS. Thus, dealers submitting supplemental claims receive two payments from WINS: first from the initial WINS submission, and second from the H-route request.

Each ASM's computer contains WINS data going back four months. Therefore, if a supplemental claim is filed within four months of its initial approval through WINS, the ASM will have direct access to the WINS information and will only need the dealer's repair order number to access it. But for supplemental

-8-

claims submitted more than four months later (GM has agreed to pay initial and supplemental warranty claims submitted up to 180 days after the repair date), the ASM must contact the regional office to obtain the WINS data and can only access it by using the VIN of the subject vehicle. Without the VIN, it is difficult, if not impossible, for the ASM to access the initial WINS claim information.[5]

### D. Genesis of the Present Disputes

#### 1. Disputes concerning Darling's supplemental claims

Darling's customary retail rates for parts and labor, which include a wide variety of pricing mechanisms, exceed GM's uniform nationwide reimbursement rates. Depending on the particular part, Darling's may determine the parts price markup according to a "matrix" (providing a different percentage markup depending on the cost of the part), a "menu" (providing a flat rate for parts and labor for certain repairs), or a "retail list" (providing a list of suggested retail prices by the manufacturer). Although Darling's most often calculates its labor time by using

---

[5]The VIN is a unique identifying number assigned to each new vehicle by the manufacturer. Because each VIN corresponds to only one particular vehicle, it provides a tool for organizing and indexing a vehicle's historical records. While other numbers are assigned to a repair (e.g., the dealer's repair order number), none of these other numbers, which are not unique to a particular vehicle, is as effective as the combination of the VIN and date of service for pinpointing a particular repair to a particular vehicle.

the "Motors Manual" -- one of a number of trade manuals used by repair shops to determine the amount of time appropriate for a given repair -- it has used at least seven different methods to determine the repair time. Moreover, Darling's has charged different labor rates depending on the repairs made, and Maine's warranty reimbursement statute permits Darling's to change its various labor rates at any time so long as it posts the new rates within the view of its service customers. As explained above, WINS is not capable of accounting for these variables.

As a result, Darling's began submitting supplemental warranty reimbursement requests in June 2000. Although Darling's initially included with its claims most of the information required by GM, it did not provide either the date of service or the VIN. GM therefore had difficulty linking the supplemental claims with the corresponding WINS claims and confirming that the claims were submitted within 180 days of the repair. As it turned out, many of Darling's claims were untimely and, because the claims lacked the VINs, GM often had to request additional information from Darling's warranty administrator, Larry Rolnick.

Less than a month after Darling's first round of supplemental submissions, Joyce Nolan, GM's Director of Warranty Operations, wrote to John Darling, president of Darling's, to request the date of service and the VIN for each supplemental claim. Nolan advised Darling that, as soon as GM received this

information, GM would supply Darling's with "procedural information on receiving payment through" WINS. Darling replied by letter, asserting that "[b]ecause the [warranty reimbursement] statute does not require this information and because it is readily available to GM as part of the initial claim submission, we have chosen not to include it as part of our supplemental retail warranty claim sheet." Nolan responded that it would be unduly burdensome for GM to locate the initial claim submissions without the VINs. But, as a "good will gesture," Nolan agreed to approve Darling's first two supplemental submissions and to provide procedural information about H-routing those claims, so long as Darling's would provide the applicable VINs by August 15, 2000. Nolan also stated that future supplemental claim submissions would not be approved if submitted without VINs. Darling's persisted in its refusal to provide VINs, failed to submit an H-route request for the first two sets of supplemental claims, and therefore never received reimbursement on those claims.

After further correspondence failed to resolve the impasse, GM's Market Area Manager assigned to Darling's, Barry Alick, arranged to meet with Darling at one of his dealerships in September 2000. Alick again explained that it was difficult for GM to access the claims history of a particular vehicle without the VIN and date of service. Nevertheless, Alick offered to pay all then-pending claims, even though many were untimely, if Darling's

would agree to provide the VINs on all future claims and to H-route approved claims for payment via WINS. Darling's agreed and subsequently H-routed over $75,000 in supplemental claims, which GM paid.

Although Darling's began to include VINs with its supplemental claims, it continued to submit them late. In a February 2001 letter, Nolan reminded Darling of the 180-day filing deadline, but again agreed to pay the pending claims in an effort to "work with you cooperatively." Nolan emphasized, however, that "going forward, GM will not approve either initial or supplemental claims for warranty reimbursement unless the claim in question is received within 180 days of the repair order date." Darling's thereafter continued to submit untimely claims, and GM denied them.

In May 2001, Darling's responded by reducing the amount of information included in its supplemental claims. Darling instructed Rolnick to design a "short form" supplemental claim that included only the repair order number, the parts and labor reimbursement that WINS had paid at the uniform rate, a summary of Darling's retail rate for parts and labor, and the difference between the uniform reimbursement and Darling's retail rate. Darling's short form not only omitted the VIN and date of service for each repair, but also the other information it had previously provided explaining the basis for its customary retail rate. The omissions made it difficult for GM to access the underlying WINS

data and left GM without a basis for assessing the reasonableness of the claims.  Rolnick testified that changing to a short claim form actually <u>increased</u> his workload because it required first preparing an internal worksheet setting forth all the information previously provided to GM, and then preparing a short form omitting certain information.

## 2.    The charge back dispute

Underlying the dispute about the information required in a supplemental claim was GM's concern that Darling's was over-charging it for warranty repairs.  Because, as a practical matter, GM does not receive any of the actual repair invoices associated with a dealer's warranty claims, it monitors warranty claims by exception.  In other words, GM pays warranty claims without verification that the dealer actually performed the work or performed the work in compliance with the dealer agreement.[6]

In order to detect excessive warranty claims, GM analyzes the claims through its Automated Warranty Administrative Review Expert ("AWARE") system.  When AWARE identifies a dealer with elevated warranty levels, GM notifies the dealer and provides it with materials to conduct a "dealer self-review."  These self-reviews allow the dealer to audit itself and identify any instances

---

[6]GM likens its warranty reimbursement process to the IRS's system for processing income tax returns.  Like the IRS, GM credits most incoming claims so long as they are internally consistent, but reserves the right to audit claims that appear suspicious.

in which it has over-charged GM or otherwise departed from the Dealer Agreement or Service Manual. If a dealer continues to exhibit apparently excessive warranty costs, GM may issue additional self-reviews and, eventually, may conduct its own "claims expense review" of selected records at the dealership.

Darling's had one of the highest "cost per vehicle serviced" and lowest customer satisfaction ratings of all the GM dealers located in the zone covering northern New England. During 1999 and 2000, its warranty claim submissions indicated elevated levels of warranty costs compared with other dealers. After Darling's performed three self-reviews, GM conducted a claims expense review in August 2000. The claims expense review revealed a number of improper warranty practices by Darling's: (1) seeking reimbursement for "goodwill" repairs made to cars covered by Darling's extended service contracts,[7] (2) charging labor hours in excess of those provided under GM's time guidelines, and (3) failing to retain parts replaced in connection with warranty repairs. As a result, GM debited $4,245 from Darling's account. After correspondence between the parties, GM agreed to re-credit

---

[7]To maintain customer "goodwill," the Service Manual empowers Darling's, in certain limited circumstances, to make repairs at no charge to the customer, and seek warranty reimbursement from GM, even though the manufacturer's warranty for the vehicle has technically expired (e.g., when the warranty only recently expired or the repairs are extensive). The Service Manual does not, however, permit Darling's to seek a goodwill reimbursement when the vehicle's repair is covered by Darling's extended service contract.

Darling's all amounts except for $1,279, the amount paid to Darling's for warranty repairs for which Darling's did not retain parts as required by the Service Manual.

### 3.    The labor rate dispute

As set forth above, WINS evaluates the labor reimbursement portion of a warranty claim based on each dealer's pre-approved warranty labor rate multiplied by the GM labor time guideline for the particular repair.  In situations where a dealer, like Darling's, charges a different retail labor rate depending on the type of repair, WINS uses a single rate based on the weighted average of the dealer's actual customer-pay experience.  To make this calculation, GM requests that the dealership submit 100 sequential repair orders that reflect the labor rates actually charged to customers.  The average of these charges becomes Darling's effective labor rate for purposes of the initial WINS reimbursement.

In September 2000, Darling's requested GM to increase its effective labor rate from $48.95 to $52.00 per hour to match its posted retail rate.  Several months later, Darling's submitted a warranty labor rate adjustment application together with supporting documentation (i.e., a form detailing 100 sequential repair orders).  This documentation revealed that the average rate Darling's actually charged customers was only $51.58.  It was lower than the posted rate because Darling's provides discounts on

certain repairs.  As a result, GM denied Darling's request for a labor rate increase.  After Darling's protested the outright denial, GM advised that it would increase Darling's effective labor rate to $51.58 upon receipt of a revised warranty labor rate adjustment application.  GM did not require Darling's to resubmit the supporting documentation.  Darling's refused to submit a revised application, so its WINS labor rate remained at $48.95.  Nonetheless, under GM's reimbursement scheme, Darling's continued to receive the difference between the WINS rate and its posted retail labor rate in response to supplemental claims.

### E.    Proceedings Below

The present lawsuit was initiated in 2001 when GM filed a complaint in federal district court seeking a declaration that Maine's warranty reimbursement statute does not prohibit GM from (1) requiring Darling's to submit its warranty reimbursement claims within 180 days of the repair date, (2) requiring Darling's to submit supplemental information (i.e., VINs and dates of service) to receive reimbursement at the retail rate, and (3) enforcing its contractual right to audit and charge back previously paid warranty claims.  Darling's responded with several counterclaims.  Counterclaim counts I and II sought damages for the supplemental claims that GM had denied because they either did not provide sufficient information (i.e., the "short form" claims) or because they were submitted late (i.e., more than 180 days after the repair

date). Count III sought damages for GM's refusal to increase Darling's initial WINS labor rate to $52.00 per hour, while Count V sought an injunction to compel GM to fully reimburse Darling's in a single step. Count IV sought damages and injunctive relief to prevent GM from auditing and debiting claims that it had previously approved. And Count VI sought damages alleging that GM had engaged in unfair and deceptive trade practices. See Me. Rev. Stat. Ann. tit. 10, § 1174.

Judgment on the pleadings was entered in favor of GM on whether GM could require Darling's to submit its warranty reimbursement claims within 180 days of the repair date. Following a bench trial, the court ruled in favor of GM on all the remaining claims, holding that (1) GM's multi-step reimbursement system is permissible under the statute, (2) GM's refusal to increase Darling's initial reimbursement labor rate to $52.00 did not violate the statute, (3) GM's requirement that Darling's provide the VIN and date of service with each claim does not violate the statute, (4) GM has a contractual right, which does not violate the statute, to audit and charge back amounts paid for warranty repair reimbursement, during the statutory approval period, and (5) GM's actions did not constitute unfair or deceptive trade practices under § 1174. See Gen. Motors Corp. v. Darling's, 324 F. Supp. 2d 257 (D. Me. 2004) ("GM-Darling's I"). Although the court initially expressed no opinion as to whether GM could exercise its charge

back rights outside the statutory approval period, it subsequently amended its judgment, holding that the statute prohibited GM from charging back Darling's warranty claims <u>after</u> the statutory period had elapsed. See <u>Gen. Motors Corp.</u> v. <u>Darling's</u>, 330 F. Supp. 2d 9 (D. Me. 2004) ("<u>GM-Darling's II</u>"). GM appeals from the court's amended judgment, and Darling's cross-appeals from the court's other rulings.[8]

## II.     DISCUSSION

### A.  Standard of Review

Statutory interpretation typically raises questions of law engendering de novo review. <u>United States</u> v. <u>Zenon-Encarnacíon</u>, 387 F.3d 60, 63 (1st Cir. 2004). Similarly, the district court's interpretation of the GM-Darling's Agreement is reviewed de novo. <u>Servicios Comerciales Andinos, S.A.</u> v. <u>Gen. Elec. Del Caribe, Inc.</u>, 145 F.3d 463, 469 (1st Cir. 1998). But the lower court's factual findings will remain undisturbed absent clear error. <u>Gallo Motor Ctr., Inc.</u> v. <u>Mazda Motor of Am., Inc.</u>, 347 F.3d 20, 24 (1st Cir. 2003).[9]

---

[8]The Maine Auto Dealers Association filed an amicus curiae brief in support of Darling's.

[9]Because Darling's is the party asserting the affirmative of the controlling issues in the case, i.e., statutory violations by GM, the district court held that Darling's bore the burden of proof. Darling's does not contest that ruling on appeal.

### B. GM's Right to Audit and Charge Back

As set forth above, GM sought a declaration that the Maine warranty reimbursement statute "does not prohibit GM from exercising its contractual right to audit paid warranty claims and charge back improperly paid amounts." In the district court, GM argued that, pursuant to the GM-Darling's Agreement, it has the right to audit warranty reimbursement claims, and that § 1176 does not limit that right. Darling's countered that GM has no such contractual right, and that GM's charge back of $1,279 violated the statute.

In its initial ruling, the district court considered only whether GM could charge back amounts improperly paid during the statutory approval period. The court first examined the parties' contractual relationship and concluded that the plain language of the Service Manual gave GM the right to debit claims previously paid to Darling's, if Darling's failed to retain parts removed in the course of warranty repairs for 15 days following GM's reimbursement for such repairs. Turning to the statute, the court found "no basis on which to conclude that a debit during the statutory time frame for approving or disapproving a claim violates section 1176." GM-Darling's I, 324 F. Supp. 2d at 276.

The court subsequently granted GM's motion to amend its judgment to clarify whether GM could audit and charge back improperly paid warranty claims after the statutory period for

approval. The court first determined that "charge-backs after the expiration of the statutory period in fact operate as disapprovals of the claim, since the dealer is deprived of some or all of the amount that it was previously awarded as reimbursement for performing warranty repairs." GM-Darling's II, 330 F. Supp. 2d at 11. It then concluded that the plain language of § 1176 "makes no provision for future disapprovals" after the statutory period. Id. The court rejected GM's contentions that it is not feasible to conclusively verify all warranty claims within the statutory period; that, as a result, manufacturers would be forced to bear increased costs with respect to warranty reimbursement; and that those increased costs would ultimately be passed on to consumers. Id. at 11-12. Based on the evidence before it, the court concluded that "GM will be able to effectively implement reasonable verification procedures within the confines of the sixty-day requirements." Id. at 12. Moreover, the court noted that GM is still permitted to audit its dealers outside the statutory period, and, although it cannot charge back such claims, it has "other contractual rights which it can attempt to exercise to manage recalcitrant dealers." Id.

Darling's challenges the district court's initial judgment. While conceding that the Dealer Agreement affords GM general audit rights, Darling's argues that the right to "audit" does not encompass the right to charge back a claim that has

already been approved and paid. Darling's contends that this is so because no provision of the GM-Darling's Agreement can fairly be interpreted as giving GM the right to charge back claims. We disagree for the reasons set forth by the district court, see GM-Darling's I, 324 F. Supp. 2d at 274-76, and see no need to restate its persuasive reasoning. See Lawton v. State Mut. Life Assurance Co. of Am., 101 F.3d 218, 220 (1st Cir. 1996) ("[W]hen a lower court produces a comprehensive, well-reasoned decision, an appellate court should refrain from writing at length to no other end than to hear its own words resonate."). We therefore conclude that GM has a contractual right to debit previously paid claims where Darling's has failed to retain parts in accordance with GM's parts retention policy.[10]

Darling's next argues that the approval period provision of § 1176 limits GM's contractual right to audit and charge back improperly paid warranty claims. It provides that all warranty reimbursement claims "must be either approved or disapproved within 60 days of their receipt." Darling's argues that this language is unambiguous and absolute -- once "approved," a claim is final. Darling's contends that the statute does not specifically provide manufacturers with a right of "look back" or "re-approval."

---

[10]We note that this case presents only the issue of GM's contractual right to charge back for violations of the parts retention policy. We express no opinion as to whether GM has a right to debit claims for any other reason.

According to Darling's, this statutory silence supersedes GM's contractual right to audit and charge back claims once they have been approved. Alternatively, Darling's argues that GM must, at a minimum, respect the approval deadline set forth by the statute. Darling's embraces the reasoning of the district court's amended judgment -- that allowing a manufacturer to "tentatively" approve and pay a claim during the 60-day statutory period, only to subsequently disapprove and debit the claim after the statutory period has expired, would "render the statutory language virtually meaningless." GM-Darling's II, 330 F. Supp. 2d at 11.

In analyzing this argument we "examin[e] the plain meaning of the statutory language and consider[] the language in the context of the whole statutory scheme." Darling's v. Ford Motor Co., 825 A.2d 344, 346 (Me. 2003) ("Darling's-Ford III"). In so doing, we "avoid statutory constructions that create absurd, illogical or inconsistent results," and will only look behind the plain language to the legislative history, "if we find the statute ambiguous." Id.; Acadia Motors, Inc. v. Ford Motor Co., 44 F.3d 1050, 1055 (1st Cir. 1995) ("Acadia I") ("Only when the language of the statute is ambiguous should courts look beyond the words of the statute to its history, policy or other extrinsic aids to ascertain statutory intent."). A statute is ambiguous only if it admits of more than one reasonable interpretation. In re Thinking Machs. Corp., 67 F.3d 1021, 1025 (1st Cir. 1995).

-22-

Darling's argument proceeds from the erroneous assumption that a manufacturer needs statutory authorization to audit and charge back improperly paid warranty claims. As Darling's recognizes, there is no basis in the statute for imposing such a requirement. And the statute's silence means precisely the opposite of what Darling's says that it means. Cf. Acadia I, 44 F.3d at 1056-57 (holding that, where § 1176 did not explicitly prohibit manufacturers from assessing a surcharge to defray the cost of complying with the statute, such a prohibition should not be read into the statute by the courts); Acadia Motors, Inc. v. Ford Motor Co., 799 A.2d 1228, 1231 (Me. 2002) ("Acadia II") (agreeing with the First Circuit that § 1176 does not prohibit a manufacturer from imposing a surcharge given the statute's silence with regard to cost recovery); Darling's v. Ford Motor Co., 719 A.2d 111, 115 (Me. 1998) ("Darling's-Ford II") (holding that Darling's was entitled to reimbursement at its "flat rate" prices where neither the plain language nor the legislative history of § 1176 explicitly prohibited a dealer from setting its retail rate in such a manner). Absent a clear mandate from the legislature, we are disinclined to unnecessarily interfere with the bargains that have been struck between the manufacturers and their distributors. See Acadia I, 44 F.3d at 1057 (cautioning that federal courts should interpret state statutes narrowly, careful not to impose prohibitions not supported in the statute); 2 Norman J. Singer,

Sutherland on Statutes and Statutory Construction § 61:6 (6th ed. 2000) (stating that statutes in derogation of a natural or common right, including statutes that "threaten[] to invade an existing property or contract right," must be narrowly interpreted). We therefore reject Darling's contention that an improperly approved claim cannot be audited and debited within the statutory period for approval.

The closer question is (or rather was, see infra) whether the charge back of a claim is effectively a "disapproval" of the claim, which must occur within the statutory approval period. GM-Darling's II, 330 F. Supp. 2d at 11. Darling's defends the district court's reasoning, contending that "approved" cannot be construed to mean "preliminarily" or "tentatively approved." GM counters that the provision was designed solely to ensure that dealers are promptly paid for performing warranty repairs, and has no bearing on whether a manufacturer may impose verification and recovery procedures after approval.

Whatever merit there might have been to GM's position, Maine's Supreme Judicial Court recently decided the issue against it and consistent with the district court's ruling. See Darling's v. Ford Motor Co., 892 A.2d 461, 464-65 (Me. 2006) (holding that a manufacturer must issue final decisions on warranty claims within the statutory period). As a federal court sitting in diversity, we are obliged to give effect to the SJC's authoritative construction

of the Maine statute.  Accordingly, we reject GM's appeal and affirm the district court's conclusion that any charge backs must take place within § 1176's statutory approval period.

### C.  Darling's Counterclaims

#### 1.  The validity of GM's reimbursement process

Darling's argued at the bench trial that § 1176 does not permit a manufacturer to reimburse its dealer in a multi-step process whereby the dealer initially receives only partial reimbursement.  The district court rejected this argument, finding nothing in the statute requiring a manufacturer to reimburse its dealers at the retail rate in one lump-sum payment.  GM-Darling's I, 324 F. Supp. 2d at 270.  The court also found, as a factual matter, that GM's multi-step reimbursement process is not "so complicated and costly that it circumvents the purposes of the statute by preventing or unreasonably interfering with reimbursement at the retail rate."  Id.  The court found that the administrative costs to Darling's of complying with GM's two-step process are reasonable, and that it would be overly burdensome to GM to modify WINS or to convert to a manual processing system so that GM could reimburse Darling's in one step.  See id. at 270-71.

Darling's argues on appeal that the plain language of § 1176 mandates that GM fully reimburse Darling's at the retail rate in one payment.  Darling's contends that each time GM makes a payment at the uniform WINS rate, it violates the statute by

-25-

reimbursing Darling's below its customary retail rate. Darling's maintains that its interpretation of the statutory text is consistent with the legislature's intent to treat manufacturers the same as any other service customer. Because ordinary non-warranty customers are not entitled to pay repair bills in incremental steps, Darling's argues, neither should GM. Finally, Darling's contests the court's factual findings that it would be prohibitively difficult for GM to modify WINS to allow full reimbursement at the retail rate in one step, and that it would be overly burdensome for GM to review Darling's claims manually in the first instance.

As with Darling's audit and charge back argument, this argument fails because it attempts to extract more restrictions from the statute than the plain language supports. The pertinent language from the statute states:

> [T]he [manufacturer] shall <u>properly and promptly</u> fulfill its warranty obligations . . . and . . . shall reimburse the [dealer] for any parts . . . provided at the retail rate customarily charged by that [dealer] . . . [and] shall reimburse the [dealer] for any labor . . . performed at the retail rate customarily charged by that [dealer] . . . .

Me. Rev. Stat. Ann. tit. 10, § 1176 (emphasis added). The "properly and promptly" language sets forth two goals. Manufacturers must act promptly to reimburse their dealers, but they must also take care that their calculations are proper. As noted above, the statute specifically provides that manufacturers

-26-

have 60 days (previously 30 days) to approve or disapprove a warranty reimbursement claim, and have an additional 60 days (previously 30 days) after approval to pay an approved claim. Id. The proper reimbursement rate is, of course, the dealer's customary retail rate. Id. We agree with the district court's conclusion that GM properly and promptly fulfills its warranty obligations by reimbursing Darling's at its customary retail rate within 60 days of approval. It is of no consequence that GM pays its reimbursements in increments, so long as the full retail rate is paid within the statutory time-frame.

Although the statute sets forth the basic parameters for processing warranty claims, we see no indication, either on the face of the statute or in its legislative history, prescribing how GM must structure its claims processing system. That the legislature sought to equalize the cost of warranty and non-warranty repairs does not mean, as Darling's argues, that it intended that manufacturers would pay for repairs in the same way as non-warranty customers. Moreover, GM's multi-step reimbursement system appears to strike a reasonable balance of the statutory goals: prompt yet accurate reimbursement. The initial step allows dealers to collect a significant portion of their reimbursement in short order. Despite the fact that the statute gives GM 120 days to approve and pay warranty reimbursement claims, 90 percent of all initial WINS claims are approved and paid, albeit at GM's uniform

-27-

nationwide rate, within ten days of submission. To ensure that the claimed retail rates are bona fide, however, GM manually reviews each supplemental claim seeking reimbursement in excess of GM's uniform nationwide rate. Although GM takes more time to process the supplemental claims, approved claims are paid within the statutory deadlines.

We also reject Darling's contention that GM's reimbursement process places administrative burdens on Darling's that effectively defeat the statute's purpose of equalizing the costs of warranty and non-warranty repairs. The district court found that, given the amount of supplemental claims paid by GM to Darling's -- over $200,000 in one 20-month period -- compared to the minimal administrative costs associated with submitting those claims -- approximately $6,500 during that same period -- GM's two-step warranty reimbursement process is not unreasonably burdensome. GM-Darling's I, 324 F. Supp. 2d at 270. We agree that when these administrative costs are compared to the returns, they "are not so out-of-line . . . as to raise concerns about whether Darling's is truly being reimbursed at its retail rate." Id. at 271.

Because we affirm the district court's rulings that § 1176 does not prohibit GM's claims processing system, and that the administrative costs associated with filing supplemental claims are so insignificant that they do not defeat the purpose of the statute, we need not consider whether GM could modify WINS to allow

one-step reimbursement, or whether GM could manually review all warranty reimbursement claims in the first instance.

## 2. Darling's effective labor rate

Darling's argued below that GM violated § 1176 by refusing to increase Darling's approved warranty reimbursement labor rate used by WINS in the initial step of the reimbursement process. As explained above, the labor rate used by WINS is calculated by averaging the labor rates charged in 100 sequential non-warranty repairs. GM calls it the "effective labor rate." Darling's submitted an application requesting an increase in its effective labor rate from $48.95 to $52.00 per hour to reflect its posted labor rate, but the paperwork submitted by Darling's only supported an increase to $51.58. GM indicated to Darling's that it would increase Darling's labor rate to $51.58 upon submission of a revised warranty labor rate application, but Darling's never filed a revision.

The district court upheld GM's refusal to increase Darling's labor rate to $52.00. The court noted that since GM's multi-step reimbursement system is permissible under § 1176, "the issue of GM's 'refusal' to increase Darling's labor rate in the initial reimbursement stage is probative only as to whether GM has complicated the reimbursement process to the extent that dealers are discouraged from making supplemental claims." GM-Darling's I, 324 F. Supp. 2d at 272. Because Darling's did not allege that GM

failed to reimburse Darling's at its full labor rate following submission of its supplemental claims, the court concluded that the evidence did not support such a conclusion. The court also noted that GM had expressed a willingness to increase Darling's labor rate following its submission of a revised application, and the court found that the administrative burden of submitting such a revised application would be "virtually nonexistent." Id.

On appeal, Darling's focuses on GM's practice of calculating the initial WINS reimbursement based on Darling's "effective" or average rate. Essentially repeating its argument that GM must reimburse its Maine dealers in a single step, Darling's contends that the statute does not contemplate payments at the effective rate, but rather, requires that its labor costs be reimbursed at the customary retail rate only. Because it has established its customary retail labor rate by posting its labor rates in a place conspicuous to its service customers, see Me. Rev. Stat. Ann. tit. 10, § 1176; id. tit. 29-A, § 1805, Darling's argues that GM must reimburse at that rate. Darling's further argues that GM's initial use of an effective rate amounts to arbitrary and capricious behavior because the evidence establishes that WINS is capable of assigning a unique labor rate to each dealer. Darling's contends that WINS could reimburse Darling's at its actual retail labor rate -- i.e., its posted labor rate -- in the first instance

without requiring the submission of unnecessary warranty labor rate applications.

As the district court properly concluded, Darling's statutory argument cannot stand in light of our holding that GM's multi-step reimbursement system is lawful. That Darling's receives less than its full retail reimbursement rate in the initial step is not a violation of the statute so long as GM pays Darling's its full retail rate within the statutory period for approval and payment. And Darling's does not dispute that GM has paid it the difference between its retail rate and its effective rate in response to its supplemental reimbursement requests.

Darling's fares no better in its alternative argument -- that, because WINS has the capability of fully reimbursing Darling's in one step, requiring the submission of unnecessary documentation to establish an effective rate, and thus unnecessarily dragging out the reimbursement process, is arbitrary and capricious behavior in violation of the statute. Darling's argument fails because of its stipulation that it charges different retail labor rates depending on the type of repair. Although WINS has the capability of programming one unique labor rate for each dealer, the court supportably found that it is not capable of accounting for multiple labor rates for each dealer. Therefore, it is not unreasonable for GM to reimburse Darling's based on an average labor rate in the first instance, and then for the

difference between that average rate and the actual retail rate in response to a supplemental claim.

### 3. The VIN and date of service requirement and the 180-day submission deadline

As noted above, after nearly a year of negotiating with Darling's concerning the information required for a supplemental claim, and after repeatedly reminding Darling's of the 180-day submission deadline provided in the Service Manual, GM denied several of Darling's supplemental claims as untimely. When Darling's retaliated by submitting "short form" claims omitting the VIN and date of service, GM denied those as well. GM's amended complaint sought declarations that § 1176 does not bar GM from requiring Darling's to include the VIN and date of service with each supplemental claim, and that GM is not obligated to pay any warranty reimbursement claim that is not submitted within 180 days of the repair. Darling's countered that its "short form" claims provided all the information required by Maine law. Darling's also argued that the only deadline for the submission of a warranty reimbursement claim is set forth in the statute of limitations provision of the Dealer Act. See Me. Rev. Stat. Ann. tit. 10, § 1183 (setting a four-year limitation period for "[a]ctions arising out of any provision of" the Dealer Act). Thus, Darling's sought damages for the over $122,000 in warranty claims denied by GM.

With regard to 180-day submission deadline, the district court granted GM's motion for judgment on the pleadings, holding

-32-

that the 180-day limit set forth in the Service Manual is binding on the parties as to both initial warranty claims and supplemental claims.  In so doing, the court rejected Darling's argument that the Dealer Act's limitation period sets the time period for submitting a claim for reimbursement.  Cf. Darling's-Ford II, 719 A.2d at 117 (answering certified questions posed by the federal district court in Darling's-Ford I, and holding that because § 1176 does not bar a manufacturer from imposing a reasonable time limit for warranty submissions, the district court was correct in concluding that Ford's 180-day limit was permissible under the statute).[11]  Following the bench trial, the court also upheld GM's contractual right to require the VIN and date of service "as part of a 'sufficiently individualized' claim." GM-Darling's I, 324 F. Supp. 2d at 274.  The court found that GM had a reasonable basis for requiring the VIN and date of service, and that Darling's refusal to provide such "readily available" information was unreasonable.  Id. at 273.

On appeal, Darling's abandons its argument that the statute's limitations period sets the claims submission deadline. Instead, it presents a new argument that attempts to distinguish the present case from Darling's-Ford I and Darling's-Ford II by arguing that its late claim submissions were justified by GM's

_____

[11]After the court's judgment on the pleadings was entered, the 2003 amendment to § 1176 specifically incorporated a 90-day deadline for the submission of warranty reimbursement claims.

delay in creating a supplemental claims procedure. Darling's contends that, because GM did not provide it with a "mechanism within which to bring its ongoing and past due warranty reimbursement rights to the attention of GM," we should not enforce GM's 180-day submission deadline. As this argument was not raised below, we do not consider it now. See B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 40 (1st Cir. 2004) (holding that in the absence of extraordinary circumstances, "legal theories not raised squarely in the lower court cannot be broached for the first time on appeal") (quotation omitted)).[12]

With respect to the VIN and date of service dispute, Darling's hinges its argument on a faulty interpretation of the SJC's opinion in Darling's-Ford II. Darling's contends that the SJC set forth a definitive statement of what information the statute requires a dealer to include in its claims for reimbursement: (1) the original computerized claim number, (2) the retail amount claimed, (3) the amount the dealer received under the uniform nationwide system, (4) the nature of the claim (i.e., parts or labor), and (5) the difference between the amount received and

---

[12]Even were we to give Darling's the benefit of plain error review, there would be no basis for reversal in this case. The onus of filing a claim for warranty reimbursement resides with the dealer. See, e.g., Darling's-Ford II, 719 A.2d at 114 (holding that the statute requires the dealers to submit claims that are sufficiently individualized to enable the manufacturers to satisfy their obligations). Nothing in the statute obligates GM to initiate the development of reimbursement claims forms.

the retail price. See 719 A.2d at 114-15.[13] Because the SJC did not include the VIN and date of service in this list, Darling's argues, the statute does not require such information to accompany its supplemental claims.

Darling's argument is again premised on the faulty assumption that GM can only exercise rights vis-á-vis its dealers that are expressly provided for in the statute. This is not so. We agree with the district court's interpretation of Darling's-Ford II. The SJC's opinion does not suggest that the five items considered in that case were the only items that a manufacturer could require a dealer to provide in its warranty reimbursement claims. See GM-Darling's I, 324 F. Supp. 2d at 273 n.14; Darling's-Ford II, 719 A.2d at 114-15. Again, where the statute does not expressly regulate a particular issue, we will not interpret it to control an area that is governed by the terms of a dealer-manufacturer agreement. See supra at 24-25.

---

[13]The district court, acting pursuant to Me. Rev. Stat. Ann. tit. 4, § 57 and Me. R. Civ. P. 76B, requested instructions from the SJC regarding interpretation of § 1176. Inter alia, it asked whether § 1176 requires a dealer "to make a 'particularized claim' to a manufacturer in seeking reimbursement for warranty work?" Darling's-Ford II, 719 A.2d at 114. If so, the district court asked whether the Darling's claims, which contained the five items listed above, "meet the 'particularized claim' requirement?" Id. The SJC answered both questions in the affirmative. First, the SJC stated that accomplishing the objectives of § 1176 "necessarily requires that a dealer submit a claim that is sufficiently individualized to enable a manufacturer to satisfy [its warranty reimbursement] obligations." Id. Second, the SJC found that the Darling's claims were "sufficient to show that Darling's meets the statutory requirement for an individualized claim." Id. at 115.

-35-

The district court supportably found that, under the Dealer Agreement, GM has a right to "such information and assistance as may reasonably be requested by [GM] to facilitate compliance with applicable laws, regulations, investigations and orders relating to products." GM-Darling's I, 324 F. Supp. 2d at 266, 274 (quoting the Dealer Agreement). The Dealer Agreement further provides that the refusal to provide such information constitutes a breach. See id. Thus, although the statute may not require Darling's to submit the VIN and date of service with its supplemental claims, the GM-Darling's Agreement does require it so long as the request is reasonable.

We conclude that the court's finding -- that inclusion of the VIN and date of service on supplemental claims greatly facilitates the claims administration process while imposing only a marginal burden on Darling's -- was not clearly erroneous. See id. at 273. The evidence establishes that the most efficient way for GM to pinpoint a particular repair is through use of the VIN and date of service. Moreover, Darling's warranty administrator acknowledged that it is actually less burdensome for Darling's to provide the VIN and date of service data because omission of that data requires the extra step of creating a "short form" claim. Given the added administrative efficiencies, and the lack of any burden imposed on Darling's, we hold that GM may reasonably require Darling's to furnish the VIN and date of service with each

supplemental claim, and that, pursuant to the GM-Darling's Agreement, Darling's is not entitled to reimbursement where such information is withheld.

### 4. Unfair and deceptive trade practices

Finally, Darling's argues that GM's failure to honor the deadlines of § 1176, its refusal to reimburse Darling's claims that were submitted without the VINs and dates of service, its refusal to approve Darling's application for a labor rate increase, and its insistence on the right to debit previously approved and paid warranty reimbursement claims constitute arbitrary and unconscionable conduct in violation of Me. Rev. Stat. Ann. tit. 10, § 1174 (providing, in relevant part, that "[i]t shall be unlawful for any . . . [m]anufacturer . . . to engage in any action which is arbitrary, in bad faith or unconscionable and which causes damage to any of said parties or to the public"). In light of our holdings above, finding no violations of § 1176 and no other indication that GM's conduct was arbitrary or in bad faith, we affirm the district court's ruling rejecting this claim.[14]

## III. Conclusion

For the foregoing reasons, we **affirm** the district court's judgment in all respects.

**So ordered.**

---

[14]We also deny Darling's request for attorney's fees.

-37-