# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| General Motors, LLC,<br>          Petitioner | : |
| | : |
| | : |
| v. | : No. 1075 C.D. 2016 |
| | : ARGUED: December 12, 2016 |
| Bureau of Professional and | : |
| Occupational Affairs, State Board of | : |
| Vehicle Manufacturers, Dealers and | : |
| Salespersons, | : |
|           Respondent | : |

BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                HONORABLE JULIA K. HEARTHWAY, Judge
                HONORABLE JOSEPH M. COSGROVE, Judge


OPINION BY
JUDGE HEARTHWAY              FILED:  August 16, 2017


General Motors, LLC (GM), petitions for review of the June 10, 2016 final order of the Department of State, State Board of Vehicle Manufacturers, Dealers and Salespersons (Board), sustaining two counts of a protest filed by Budd Baer, Inc., Mel Grata Chevrolet, Inc., and Turner Automotive of New Holland, Inc. (collectively, Protesting Dealers). Protesting Dealers elected to invoke a statutory provision that changed the manner in which they are reimbursed for warranty parts. The Board determined that GM was not permitted under its contract with Protesting Dealers to adjust the manner in which it reimbursed Protesting Dealers for warranty labor in response to Protesting Dealers' action. The Board also ruled that GM was not permitted to impose a surcharge on Protesting Dealers to recover increased warranty costs resulting from Protesting Dealers' election. For the reasons set forth below, we reverse.

This dispute on reimbursement for warranty service between GM and Protesting Dealers arises from conflicting interpretations of the Board of Vehicles Act[1] (Act), "a comprehensive statute governing the relationship between automobile manufacturers and their franchise dealers." *Rosado v. Ford Motor Co.,* 337 F.3d 291, 293 (3d Cir. 2003).

In addition to the Act, the relationship between GM and its dealers is also governed by Dealer Sales and Service Agreements (Dealer Agreements).[2] Dealers agree in Dealer Agreements to perform warranty repairs and services on qualified vehicles.[3] Although warranty repairs are provided to consumers at no additional charge, the anticipated cost of those repairs is built into the price of new vehicles.[4] GM agrees in Dealer Agreements to reimburse dealers for that work in accordance with the Service Policies and Procedures Manual (SPPM).[5]

Pursuant to the SPPM, GM reimburses dealers for the labor costs in warranty work in one of two ways:

(1) Dealer retail rate (known as Option A), where dealers are reimbursed at the rate they use for similar non-warranty repairs and service; or

---

[1] Act of December 22, 1983, P.L. 306, *as amended*, 63 P.S. §§ 818.1-818.37.
[2] Stipulation of Facts (SF), 2/12/16, ¶ 6.
[3] SF at ¶ 11.
[4] SF at ¶ 25.
[5] SF at ¶ 13.

(2) CPI-based rate (known as Option C), where GM and dealer agree to a base labor rate that is periodically adjusted according to the Consumer Price Index.[6]

Unless otherwise required under state law, GM reimburses dealers for parts used in warranty work at a standard rate of 40 percent over dealer cost.[7] Alternatively, pursuant to the Act, dealers may elect to be reimbursed for parts at the statutory dealer's retail rate. Section 9(a)(2) states, "Compensation for parts, including major assemblies used in warranty service, shall be at the dealer's retail rate. . . ." and then addresses the process for establishing a dealer's retail rate. 63 P.S. § 818.9(a)(2). Thus, Pennsylvania dealers have a choice between receiving parts reimbursement pursuant to the statute's retail rate or an alternative rate agreed upon by the parties.

Dealers may also elect under the Act to be reimbursed for warranty labor at a statutory dealer's retail rate. Echoing section 9(a)(2), section 9(a)(3) states, "Compensation for labor used in warranty service shall be at the dealer's retail rate. . . ." 63 P.S. § 818.9(a)(3). As with parts reimbursement, the Act offers a statutory dealer's retail rate for labor as an option available to dealers.

In 2012, GM implemented a policy under which any dealer that sought retail reimbursement for parts (instead of standard contractual reimbursement of 40% over cost) would be ineligible for Option C/CPI-based

---

[6] SF at ¶¶ 16-18.

[7] SF at ¶ 23.

3

reimbursement for labor.[8]  In other words, dealers that choose retail reimbursement for parts would also be required to accept Option A/retail reimbursement rate for labor under the policy.  The policy change was communicated to dealers in the second edition of the 2012 SPPM.[9]

In 2014, Protesting Dealers requested retail reimbursement pursuant to section 9(a)(2) of the Act for warranty parts (instead of standard reimbursement of 40% over cost).[10]  Prior to these requests, Protesting Dealers were enrolled in the Option C/CPI-based reimbursement program for labor.[11]  Protesting Dealers did not request Option A/retail reimbursement for labor,[12] nor did they seek to invoke section 9(a)(3) to compel retail rate reimbursement for warranty labor.

GM approved the requests for retail reimbursement for parts.[13]  But pursuant to the SPPM, Protesting Dealers' reimbursement program for labor was changed from Option C/CPI-based rates to Option A/retail rates as a consequence of Protesting Dealers' election to receive retail rate reimbursement for warranty parts.[14]  In addition, GM imposed a cost recovery surcharge of $122 per vehicle in response to the adjustments in reimbursement rates for warranty parts.[15]

---

[8] SF at ¶ 20.
[9] *Id.*
[10] SF at ¶ 28.
[11] SF at ¶ 41.
[12] SF at ¶ 40.
[13] SF at ¶¶ 33, 36 and 39.
[14] SF at ¶ 42.
[15] SF at ¶¶ 43-45.

4

Protesting Dealers objected to the change in reimbursement for warranty labor rates (which was done pursuant to GM policy as set forth in the SPPM and not at Protesting Dealers' request). Protesting Dealers also objected to the imposition of the cost recovery surcharge.[16] Those objections were presented to the Board, which concluded that the Act prohibited GM from (1) transferring Protesting Dealers to Option A/retail reimbursement rates for warranty labor; and (2) imposing a cost recovery surcharge on Protesting Dealers of $122 per vehicle.[17] This petition for review followed.[18]

First we address whether the Board erred in determining that GM violated section 9(a)(3) of the Act by converting Protesting Dealers to retail rate reimbursement for *labor*—pursuant to its contract with Protesting Dealers—when Protesting Dealers elected to receive retail rate reimbursements for *parts* under the Act. The parties agree that Protesting Dealers are entitled under the Act to elect to be reimbursed at the statutory retail rate for warranty parts. They disagree about the consequences of that election on reimbursement for warranty labor, however. This is an issue of first impression.

Protesting Dealers argue that they have not elected retail labor reimbursement under the Act, and that GM may not "unilaterally" transfer them to retail labor reimbursement. GM argues that under the terms of the SPPM, Protesting Dealers' election for statutory retail rate reimbursement for warranty

---

[16] SF at ¶ 46.

[17] Final Adjudication and Order, Docket No. 1325-60-2014, 6/10/16.

[18] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704. The questions raised in this case are questions of law.

5

parts renders them ineligible for labor reimbursement under the CPI-adjusted Option C program. GM contends that under the SPPM, Protesting Dealers must be converted to Option A, under which Protesting Dealers would be reimbursed at a retail rate for warranty labor as defined by the SPPM.

The Board agreed with Protesting Dealers, concluding that GM violated the Act by converting Protesting Dealers' labor reimbursement from Option C to Option A without a request from Protesting Dealers to do so. The Board stated, "nowhere in section 9 of the Act is there any statutory authority for the manufacturer to unilaterally choose to seek a change of rate compensation in the absence of a request from a dealer."[19]

The basis and scope of the Board's authority is defined by the Act. Section 4(a)(4) of the Act sets forth the general power of the Board to "[a]dminister and enforce" the Act. 63 P.S. § 818.4(a)(4). In the context of a filed protest, section 4(d)(5) empowers the Board to compel compliance with the Act. 63 P.S. § 818.4(d)(5). However, the Board acknowledges that it does not have jurisdiction to adjudicate disputes arising from the contract between GM and Protesting Dealers.[20]

In rejecting GM's argument that its contract with Protesting Dealers rendered them ineligible for Option C labor reimbursement once they elected to be reimbursed for warranty parts at a retail rate, the Board stated, "nothing in section

---

[19] Board decision at 13-14.

[20] *Id.* at 12.

6

9 of the Act permits parties to waive its terms."[21]   Similarly, the Board rejected GM's argument that absent an election for retail rate reimbursement for warranty labor under section 9(a)(3), the parties' contract controls such labor reimbursement: "The Board also rejects this argument, as again there is not statutory support for it."[22]   These rulings appear to be premised on the supposition that the parties may not agree to terms that are not expressly authorized by the Act.

The Act does not so restrict the ability of the parties to contract, however.   Properly understood, section 9 of the Act provides a safeguard for dealers that are dissatisfied with the warranty reimbursement available to them under their contracts with manufacturers.   Section 9 creates a statutory level of reimbursement that a dealer may rely upon.   However, section 9 does not preclude manufacturers and dealers from contractual agreement to a different arrangement for warranty reimbursement.

The Board's ruling reflects a misapprehension of the basis for GM's conversion of Protesting Dealers' labor rate reimbursement from Option C to Option A.   GM's action was grounded in the parties' agreement, not the Act.   GM was not seeking unilaterally to invoke section 9(a)(3) of the Act; GM was proceeding according the terms of its contract with Protesting Dealers.   That contract offers Option C reimbursement for warranty labor only if a dealer agrees to standard reimbursement for warranty parts.   Option C is not a creation of the Act; it is a creation of the contract, and the contract may define Option C eligibility.   Section 9(a)(3) of the Act offers Protesting Dealers the safeguard of

---

[21] *Id.* at 11.
[22] *Id.*

statutory retail rate reimbursement for labor if Protesting Dealers are dissatisfied with the reimbursement available pursuant to the agreement with GM. The Act does not protect Protesting Dealers' access to Option C. The question of whether GM may make this change to Protesting Dealers' warranty labor rate reimbursement is a contractual question over which the Board has no jurisdiction. Therefore, the Board erred as a matter of law when it concluded that the shift of Protesting Dealers' labor rate reimbursement from Option C to Option A pursuant to their contracts with GM violated section 9(a)(3) of the Act.

Next we consider whether the Board erred in determining that GM's proposed imposition of a $122 surcharge per vehicle to recoup increased warranty parts costs—resulting from Protesting Dealers' election to receive retail rate reimbursement for parts under the Act—would violate section 9(b.4) of the Act, which is set forth below:

> **(b.4) Recovery.—**
>
> (1)(i) A manufacturer or distributor may not recover its costs from a dealer within this Commonwealth that does not apply to the manufacturer or distributor for retail rate reimbursement for parts and labor, including an increase in the wholesale price of a vehicle or surcharge imposed on a dealer intended to recover the cost of reimbursing a dealer for parts and labor under this section.
>
> (ii) A manufacturer or distributor may increase the price for a vehicle or part in the normal course of business.
>
> (2) A dealer may elect to revert to the nonretail rate reimbursement for parts and labor once in a

8

calendar year to avoid a manufacturer or distributor surcharge.

63 P.S. § 818.9(b.4).

The Board determined that GM's proposed surcharge of $122 per vehicle violated section 9(b.4)(1)(i) of the Act because Protesting Dealers only elected retail rate reimbursement for *parts* under the Act, and did *not* elect statutory retail rate reimbursement for *labor*. The Board concluded that a surcharge is only permissible when a dealer seeks statutory retail rate reimbursement for *both* parts *and* labor.[23]

GM argues that "the Act permits a manufacturer to impose a cost recovery surcharge on any dealer that receives statutory retail reimbursement for parts or labor, and only prohibits a manufacturer from imposing a surcharge on any dealer that has decided to continue to abide by the parties' agreed-upon contract

---

[23] Also within its discussion of this issue, the Board stated—

Because that question is not before it, the Board has not addressed whether a manufacturer may surcharge a dealer who has elected retail rate reimbursement for parts (but not for labor) for the cost of reimbursing dealers for parts or similarly whether a manufacturer may surcharge a dealer who has elected retail rate reimbursement for labor (but not for parts) for the cost of reimbursing dealers for labor for warranty work.

Board's decision at 13 fn. 8. This language is perplexing because the Board appears to be stating that it is not addressing the very issue it is deciding: whether GM may use a surcharge to recover its increased warranty parts reimbursement expenses. The Board appears to have premised its discussion on the idea that GM was seeking to recover increased costs relating to both parts and labor. But GM maintains it is seeking to recoup only increased *parts* costs. *See* Joint Status Report, 2/19/16, at 3.

9

rates."[24] In essence, GM contends that the statute creates a safe harbor for dealers that do not seek any retail rate reimbursement under section 9(a).

Section 9(b.4)(1)(i) provides that a manufacturer may *not* impose a surcharge on a dealer that has not sought retail rate reimbursement for parts *and* labor. This language is susceptible to more than one meaning. Consistent with Protesting Dealers' argument, this language could be understood to mean that only dealers that elect retail rate reimbursement for *both* parts and labor are vulnerable to a manufacturer surcharge. Alternatively, the provision could be read consistently with GM's position that the statute creates a safe harbor for dealers that do not invoke the statute for *any* retail reimbursement.[25] "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Office of the Governor v. Donahue,* 59 A.3d 1165, 1168 (Pa. Cmwlth. 2013) (quoting *Bethenergy Mines, Inc. v. Department of Environmental Protection,* 676 A.2d 711, 715 (Pa. Cmwlth.), *appeal denied,* 685 A.2d 547 (Pa. 1996)). When a statute is ambiguous or unclear, a court "must interpret the statute and ascertain the intention of the General Assembly." *Pelter v. Department of Transportation, Bureau of Driver Licensing,* 663 A.2d 844, 848 (Pa. Cmwlth. 1995) (citation omitted). The statutory construction of section 9(b.4)(1)(i) is also a matter of first impression.

---

[24] GM Brief at 43.

[25] As GM states in its brief, the language in Section 9(b.4)(1)(i) of the Act, "[a] manufacturer. . . may not recover its costs from a dealer. . . that does not apply to the manufacturer. . . for retail rate reimbursement for parts and labor. . . ," could reasonably be understood to mean that a manufacturer may not impose a surcharge on a dealer that (1) has not applied for retail reimbursement for parts; *and* (2) has not applied for retail reimbursement for labor. GM Brief at 40.

10

The Statutory Construction Act of 1972 sets forth rules to guide the process of ascertaining legislative intent. "Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa. C.S. § 1921(a). "[T]he intention of the General Assembly may be ascertained by considering. . . [t]he object to be obtained [and t]he consequences of a particular interpretation." 1 Pa.C.S. § 1921(c)(4) and (6). It is also presumed that the legislature "does not intend a result that is. . . unreasonable." 1 Pa.C.S. § 1922(1).

In discerning the legislative intent underlying the facially conjunctive phrase "parts and labor" in section 9(b.4)(1)(i), we must also consider the use of the same phrase in section 9(b.4)(2): "[a] dealer may elect to revert to the nonretail rate reimbursement for *parts and labor* once in a calendar year to avoid a manufacturer or distributor surcharge", 63 P.S. § 818.9(b.4)(2) (emphasis added). The use of the phrase "parts and labor" in section 9(b.4)(2) supports GM's position that a dealer must not be using *any* statutory retail warranty reimbursement to be protected from the possibility of a surcharge for increased reimbursement costs.

The self-evident object of section 9(b.4) is to permit manufacturers to recover increased costs from a dealer that invokes section 9(a) to be reimbursed at a statutorily defined retail rate instead of at the rate the parties had agreed upon in their contract. This Court cannot identify any policy reason that would justify limiting the ability of manufacturers to recover under section 9(b.4) only to instances where dealers elect to invoke retail rate reimbursement for both parts and labor.

We decline to adopt an interpretation of section 9(b.4) that would run counter to the object of the Act. *See* 1 Pa.C.S. § 1921(c). Though the Board

11

concluded that GM is barred from recovery under section 9(b.4) of the Act because Protesting Dealers invoked statutory retail rate reimbursement for only warranty parts, and not for both parts *and* labor, we presume that the General Assembly did not intend such an unreasonable result. *See* 1 Pa.C.S. § 1922(1). The Board erred as a matter of law in determining that GM was precluded from imposing a surcharge for increased parts costs in this case.

For these reasons, we reverse the Board's order.

_____
JULIA K. HEARTHWAY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

General Motors, LLC, : 
                Petitioner : 
  : 
     v. : No. 1075 C.D. 2016
  : 
Bureau of Professional and : 
Occupational Affairs, State Board of : 
Vehicle Manufacturers, Dealers and : 
Salespersons, : 
                Respondent : 

## O R D E R

AND NOW, this 16th day of August, 2017, the order of the Bureau of Professional and Occupational Affairs, State Board of Motor Vehicle Manufacturers, Dealers and Salespersons, is reversed.

_____
JULIA K. HEARTHWAY, Judge

General Motors, LLC,           :
            Petitioner       :
                                      :

          v.               :

                                        :

Bureau of Professional and         :
Occupational Affairs, State Board of   :
Vehicle Manufacturers, Dealers and   :
Salespersons,                :   No. 1075 C.D. 2016
            Respondent      :   Argued: December 12, 2016


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
              HONORABLE JULIA K. HEARTHWAY, Judge
              HONORABLE JOSEPH M. COSGROVE, Judge


DISSENTING OPINION
BY JUDGE COSGROVE             FILED: August 16, 2017


        Although I respect the exceptionally well written and reasoned Majority opinion, I cannot agree with its conclusion.

        This case requires us to define the boundaries of the Board of Vehicles Act (Act), Act of December 22, 1983, P.L. 306, *as amended*, 63 P.S. §§ 818.1-818.37, relative to automobile dealer reimbursements for parts and labor expenses incurred in performance of warranty repairs. Specifically, we must determine whether manufacturers (in this case, General Motors, LLC (Petitioner)), may require dealers, such as the present Intervenors (Protesting Dealers), who had elected retail rates for parts (as statutorily permitted) to also elect retail rates for labor. While Petitioner insists it is entitled to impose this requirement based on its contract with dealers in Pennsylvania, the State Board of Vehicle Manufacturers,

Dealers and Salespersons (Board) found in favor of the Protesting Dealers, and, in my opinion, correctly so.

The Majority recognizes that the Act is "a comprehensive statute governing the relationship between automobile manufacturers and their franchise dealers." Majority, slip op. at 2 (citing *Rosado v. Ford Motor Co.,* 337 F.3d 291, 293 (3d Cir. 2003)). As we held in *Maggiano v. State Board of Vehicle Manufacturers, Dealers, and Salespersons*, 659 A.2d 1071, 1074 (Pa. Cmwlth. 1995), the "legislative purpose of the Act" is "set forth" in "49 Pa. Code § 19.1." This provision states that the Act is an "exercise of [the Commonwealth's] police power," and is designed to "prevent frauds, impositions and other abuses upon [the Commonwealth's] citizens and to protect and preserve the investments and properties of the citizens of this Commonwealth." *Id.* Against this backdrop, it is difficult to see how the Legislature could have intended statutory language, which may be subject to two reasonable interpretations, to be viewed in a way which favors multibillion dollar corporations based in other states (or countries) over the protective interests of local automobile dealers operating within the Commonwealth. As the Majority disagrees, I believe it errs.

If this were not reason enough for a result different from the Majority's, I am concerned that we have not given appropriate deference to the Board. "[O]ur focus must center on the Board's interpretation of the Act ... [and] the Board's decision *cannot be overturned unless clearly erroneous*." *Maggiano*, 659 A.2d at 1074 (emphasis added), citing *Alpha Auto Sales v. Department of State, Bureau of Professional and Occupational Affairs*, 644 A.2d 153 (Pa. 1994). The Majority recognizes that the two questions presented are matters of "first impression," and with regard to the second, specifically notes that the statutory

language "is susceptible to more than one meaning." Majority, slip op. at 5, 10. In reversing, however, the Majority does not chide the Board for being clearly erroneous, as we required in *Maggiano*. Without such a finding, we are bound to uphold the Board's decision. Failing to do so, I must dissent.

_____
JOSEPH M. COSGROVE, Judge