IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT
**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| GENERAL MOTORS, LLC | : | No. 24 MAP 2018 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 1075 CD |
| v. | : | 2016 dated 8/16/17, reconsideration |
| | : | denied 10/12/17, reversing the decision |
| BUREAU OF PROFESSIONAL AND | : | of the State Board of Vehicle |
| OCCUPATIONAL AFFAIRS, STATE | : | Manufacturers, Dealers and |
| BOARD OF VEHICLE | : | Salespersons at No. 1325-60-2014 |
| MANUFACTURERS, DEALERS AND | : | dated 6/10/16 |
| SALESPERSONS | : | |
| | : | |
| APPEAL OF:  BUDD BAER, INC. D/B/A | : | |
| BUDD BAER BUICK GMC | : | ARGUED:  December 6, 2018 |

## OPINION

**CHIEF JUSTICE SAYLOR**                                   **DECIDED:  July 17, 2019**

In this appeal, we address a dispute between a motor vehicle and replacement parts manufacturer and independently owned and operated franchise dealers concerning reimbursement for warranty repairs.

At the times relevant to this litigation, the appellants, Baer Buick GMC and Grata Chevrolet ("Dealers"), and the appellee, General Motors, LLC, were parties to dealer sales and service agreements, per which Dealers sold and serviced vehicles manufactured by General Motors.  Under the contractual terms, Dealers committed to performing repairs required by limited warranties extended by General Motors upon sales with no additional charge to customers (albeit that the projected cost of such

repairs was factored into the purchase price for new vehicles).[1]  General Motors was then required to reimburse Dealers in accordance with a Service Policies and Procedures Manual (the "SPPM").  These commitments extended to qualified vehicles that had been sold by Dealers and to those purchased from other dealers.  *See* Stipulation at ¶¶10-11.

Through the SPPM, General Motors agreed to pay dealers at large for *labor* during warranty work under either of two options, denominated "Option A (Retail Rate) and Option C (CPI-based)."  Stipulation at ¶16.  The terms were as follows:

> Under Option A, a dealer may establish its "effective" labor rate based on an average of its retail rate, subject to certain verification requirements.
>
> Under Option C, GM offers to enter into specific labor rate agreements with its dealers pursuant to which they agree on an initial labor rate for warranty repairs, with a guaranteed minimum annual adjustment of at least 2.5% over a three year period based on the Consumer Price Index.

*Id.* at ¶¶17-18.  Option C, apparently, was the preferred option among dealers for labor reimbursement.  *See id.* at ¶19 ("Many GM dealers choose Option C because its guaranteed annual increases allow[] them to budget for their warranty labor rates for warranty repairs.").  General Motors' standard reimbursement policy for *parts* installed in connection with warranty repairs was to pay one hundred and forty percent of the dealers' costs.  *See id.* at ¶23.

---

[1] Factual matters are drawn from a stipulation of facts filed by the parties before the State Board of Vehicle Manufacturers, Dealers and Salespersons, which has served as the factual predicate for all decisions in this case.  *See* Stipulation of Facts dated Feb. 19, 2016, in *Baer Buick GMC v. General Motors LLC*, No. 1325-60-2014 (Bd. of Veh. Mfrs., Dealers & Salespersons) [hereinafter "Stipulation at ___"].  The litigants agree that the questions that have been presented throughout the litigation are entirely ones of law.

Apparently, both labor reimbursement alternatives, Options A and C, were initially made available to all dealers regardless of whether they sought reimbursement for parts under the standard contractual methodology or invoked an alternative rate, presumably under a governing regulatory statute. In 2012, however, General Motors instituted a policy effectively rendering any dealer pursuing an alternative reimbursement methodology for calculating warranty parts reimbursement ineligible for contractually-based Option C reimbursement for labor. *See* Stipulation at ¶¶20, 22 ("Eligibility [for Option C] is contingent on [Dealer's] continued compliance with GM standard parts reimbursement policy." (quoting the 2014 version of the SPPM)). Instead, the SPPM made dealers selecting extra-contractual, retail-rate reimbursement for parts eligible for remuneration for the labor component of warranty repairs only under Option A.

The business relationship between vehicle manufacturers and dealers is also regulated, in Pennsylvania, by the Board of Vehicles Act.[2] In 2012, when General Motors instituted the policy giving rise to this dispute, manufacturers were required to issue a schedule of compensation to extend "reasonable compensation" for warranty parts and labor. *See* 63 P.S. §818.9(b) (repealed). For labor, the statute specified that the hourly rate paid to a dealer "shall be no less than the rate charged by the dealer for like service to nonwarranty customers for nonwarranty service and repairs at a reasonable rate." *Id.* Notably, the statute at the time did not equate a retail rate for parts reimbursement with the required "reasonable compensation."

---

[2] Act of Dec. 22, 1983, P.L. 306, No. 84 (as amended 63 P.S. §§818.1-818.37) (the "Act").

Effective October 24, 2019, the enactment has been renumbered and further amended. *See* 63 P.S. §§101-704 (effective Oct. 24, 2019).

The Act was amended in 2013, however, to do so. *See* 63 P.S. §818.9(a)(2) ("Compensation for parts . . . shall be at the dealer's retail rate."). The governing prescription for labor was also amended to track this language, *see id.* §818.9(a)(3) ("Compensation for labor used in warranty service shall be at the dealer's retail rate."), and the general expression of a reasonableness nexus was removed. Further, the amendments added discrete methods for calculating retail rates, respectively, for parts and labor. *See id.* §818.9(a)(2), (3).

Additionally, the General Assembly added Section 9(b.4) to regulate cost recovery by manufacturers, as follows:

> **(b.4) Recovery.--**
>
> (1)(i) A manufacturer or distributor may not recover its costs from a dealer within this Commonwealth that does not apply to the manufacturer or distributor for retail rate reimbursement for parts and labor, including an increase in the wholesale price of a vehicle or surcharge imposed on a dealer intended to recover the cost of reimbursing a dealer for parts and labor under this section.
>
> (ii) A manufacturer or distributor may increase the price for a vehicle or part in the normal course of business.
>
> (2) A dealer may elect to revert to the nonretail rate reimbursement for parts and labor once in a calendar year to avoid a manufacturer or distributor surcharge.

63 P.S. §818.9(b.4). Significantly, although the Act addresses payment of retail rates in mandatory terms, *see id.* §818.9(a)(2), (3), Section 9(b.4)(2) implies, if it does not explicate, that dealers are free to accede to payment of contractual rates rather than invoking the statutory ones.

In 2014, Dealers sought retail reimbursement for warranty parts pursuant to Section 9(a)(2) of the Act while intending to remain enrolled in the contractual, Option C

reimbursement program for labor. *See id.* at ¶28. Per the SPPM, however, General Motors advised Dealers that it would change their reimbursement for warranty labor from Option C to Option A, against their wishes. *See id.* at ¶42. General Motors also conveyed to Dealers that the company intended to impose a discrete cost recovery fee, or surcharge, to new vehicle invoices, initially in the amount of $122 per vehicle. *See id.* at ¶¶43-45.

Dealers, along with several other franchise dealers, lodged a protest with the State Board of Vehicle Manufacturers, Dealers and Salespersons (the "Board"), which is charged with administering and enforcing the Act. *See* 63 P.S. §§818.4(a), 818.8(d)(1). Relevantly, with respect to the labor rate, Dealers claimed that General Motors violated Section 9(a)(3) of the Act by contractually changing the manner in which it reimburses dealers for warranty labor, when Dealers had merely exercised their statutory rights concerning reimbursement for warranty parts. They also challenged General Motors' ability to impose a surcharge on dealers that elect the statutory retail reimbursement rate for warranty parts but not labor. *See id.* §818.9(b.4)(1)(i) (providing that a manufacturer "may not recover its costs from a dealer . . . that does not apply to the manufacturer . . . for retail rate reimbursement for parts *and* labor. . . ." (emphasis added)). According to Dealers, the statute's plain language did not permit manufacturers to impose surcharges when dealers elect statutory reimbursement for parts *but not* labor. *See id.* §818.9(b.4)(1)(i), (2).

In response, General Motors contended that nothing in the Act guarantees dealers the right to participate in Option C, which is purely a matter of contract. According to General Motors:

> GM is not obligated under Pennsylvania law to offer Option C, as it often results in a higher reimbursement rate than the dealer's own retail rate. GM voluntarily offers this program

because it is administratively convenient for dealers and allows them to compete more aggressively for retail repair work by maintaining a lower retail labor rate without sacrificing the amount they receive for warranty labor reimbursement. In exchange for these benefits, however, dealers agree that their "[e]ligibility [for Option C] is contingent on [their] continued compliance with GM standard parts reimbursement policy." If a dealer instead prefers to request retail parts reimbursement rather than accept GM's standard 40% parts markup, it is no longer eligible for Option C and reverts to Option A.

Brief for General Motors dated Apr. 8, 2016, in *Baer Buick GMC*, No. 1325-60-2014, at 2.

With respect to the surcharge, General Motors recognized that the Act forbids cost recovery from dealers that have not chosen to seek retail reimbursement for "parts and labor." 63 P.S. §818.9(b.4)(1)(i). According to the company, however, Dealers did not qualify for such safe-harbor protection on account of their selection of the statutory, retail rate for parts. General Motors asserted that foreclosing manufacturers from recouping costs attendant to warranty repairs lacks economic sensibility. Moreover, according to the company, such an approach would contravene the surcharge's reversionary provision. *See id.* §818.9(b.4)(2) ("A dealer may elect to revert to the nonretail rate reimbursement for parts and labor once in a calendar year to avoid a manufacturer or distributor surcharge.").

After mediation efforts failed to resolve the above issues among the litigants,[3] the Board issued a decision, on the stipulated facts, sustaining Dealers' protest in all material respects. Initially, the Board observed that, upon the lodging of a protest, a vehicle manufacturer bears the burden to establish that it did not violate any provision of the Act. *See* 63 P.S. §818.8(d)(3). As to the labor-reimbursement rate, the Board

---

[3] Most of the protestant-dealers withdrew from the proceedings at this stage.

discerned no statutory authority that would permit the parties to waive or alter the terms of Section 9 of the Act. *See Baer Buick GMC v. General Motors LLC*, No. 1325-60-2014, *slip op.* at 11 (Bd. Veh. Mfrs., Dealers & Salespersons Jun. 10, 2016).[4] "[M]ore fundamentally," the Board opined, it was beyond its own authority to adjudicate contractual disputes. *Id.* at 11-12.[5] With respect to the surcharge issue, the Board concluded that, under Section 9(b.4)(1)(i) of the Act, "surcharge for parts and labor warranty reimbursement is permitted only where the dealer has sought both." *Id.* at 15 (footnote omitted).

On General Motors' subsequent appeal, a divided panel of the Commonwealth Court reversed. *See General Motors, LLC v. Bureau of Prof'l and Occupational Affairs*, 169 A.3d 681, 688 (Pa. Cmwlth. 2017). As to the labor-reimbursement issue, the majority found the Board's ruling to have been "premised on the supposition that the parties may not agree to terms that are not expressly authorized by the Act." *Id.* at 685. To the contrary, the majority reasoned, the Act does not restrict the ability of the parties to contract in such fashion. Rather, the majority explained:

> [p]roperly understood, section 9 of the Act provides a safeguard for dealers that are dissatisfied with the warranty reimbursement available to them under contracts with manufacturers. Section 9 creates a statutory level of reimbursement that a dealer may rely upon. However, section 9 does not preclude manufacturers and dealers from contractual agreement to a different arrangement for warranty reimbursement.

---

[4] The relevant passages of the Board's opinion fail to reconcile this conclusion with the central fact that Dealers' core claim is to a non-statutory rate of reimbursement for labor.

[5] This justification is also tenuous, since a main purport of the Board's decision is that Dealers were entitled to a non-statutory rate of reimbursement identified in Dealers' agreements with General Motors, but which was nevertheless unavailable to Dealers under the specified terms of those agreements.

*       *       *

> [The General Motors' contract] offers Option C reimbursement for warranty labor only if a dealer agrees to standard reimbursement for warranty parts. Option C is not a creation of the Act; it is a creation of the contract, and the contract may define Option C eligibility. Section 9(a)(3) of the Act offers Protesting Dealers the safeguard of statutory retail rate reimbursement for labor if Protesting Dealers are dissatisfied with the reimbursement available pursuant to the agreement with GM. The Act does not protect Protesting Dealers' access to Option C.

*Id.* Thus, the majority found that the Board misapprehended the basis for General Motors' conversion of Dealers' warranty-labor rate from Option C to Option A, *see id.* ("GM's action was grounded in the parties' agreement, not the Act."), and erred in determining that such conversion violated Section 9(a)(3) of the Act.

The majority turned to whether General Motors violated Section 9(b.4)(1)(i) of the Act by imposing surcharges, crediting General Motors' argument that the statute's restriction on cost recovery effectively creates a safe harbor for dealers that do not seek *any* retail rate reimbursement under section 9(a). The majority recognized that the statute's language providing that manufacturers cannot recover costs from dealers that do not apply for retail rate reimbursement for "parts and labor" was "facially conjunctive." *General Motors*, 169 A.3d at 687 (quoting 63 P.S. §818.9(b.4)(1)(i)). Nevertheless, the majority concluded that the phrase was "susceptible to more than one meaning," and accordingly, it was appropriate to employ tools of statutory construction to discern the underlying legislative intent. *Id.* at 686-87 (reasoning that the material language could be read in the conjunctive or as creating a "safe harbor for dealers that do not invoke the statute for any retail reimbursement").

The majority also found it material that the same "parts and labor" terminology is employed in Section 9(b.4)(2) of the Act, which prescribes that "[a] dealer may elect to

revert to the nonretail rate reimbursement for *parts and labor* once in a calendar year to avoid a manufacturer or distributor surcharge," 63 P.S. §818.9(b.4)(2) (emphasis added). According to the majority:

> The self-evident object of section 9(b.4) is to permit manufacturers to recover increased costs from a dealer that invokes section 9(a) to be reimbursed at a statutorily defined retail rate instead of at the rate the parties had agreed upon in their contract. This Court cannot identify any policy reason that would justify limiting the ability of manufacturers to recover under section 9(b.4) only to instances where dealers elect to invoke retail rate reimbursement for both parts and labor.

*General Motors*, 169 A.3d at 687. Based on this reasoning, it was the majority's position that treating "parts and labor" in the conjunctive would be inconsistent with the object of the Act. As such, the majority presumed that the General Assembly did not intend such a result, which it found to be unreasonable. *See* 1 Pa.C.S. §1922(1).

Judge Cosgrove authored a dissenting opinion, characterizing the Act as "an exercise of [the Commonwealth's] police power" designed to "prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this Commonwealth." *Baer Buick GMC*, 169 A.3d at 688 (Cosgrove, J., dissenting) (quoting, indirectly, 49 Pa. Code §19.1). Against this backdrop, the dissent reasoned:

> [I]t is difficult to see how the Legislature could have intended statutory language, which may be subject to two reasonable interpretations, to be viewed in a way which favors multibillion dollar corporations based in other states (or countries) over the protective interests of local automobile dealers operating within the Commonwealth.

*Id.* Judge Cosgrove also criticized the majority for failing to accord deference to the Board's interpretation of the Act, which he opined should be overturned only if clearly

erroneous. *See id.* (citing *Maggiano v. Pa. State Bd. of Vehicle Mfrs., Dealers, and Salespersons*, 659 A.2d 1071, 1074 (Pa. Cmwlth. 1995)).

We allowed Dealers' appeal to consider the two matters of statutory construction posed by the Board's and the Commonwealth Court's decisions, as well as Dealers' contention that the Commonwealth Court failed to afford appropriate deference to the Board. *See General Motors, LLC v. Bureau of Prof'l & Occupational Affairs*, ___ Pa. ___, 186 A.3d 937 (2018) (*per curiam*).

## I.  Section 9(a) and Option C

Dealers contend that Section 9(a) of the Act prohibits manufacturers from conditioning access to a contractual reimbursement rate on the non-exercise of a statutory right, and the contractual ineligibility requirement associated with Option C should therefore be deemed invalid to the extent that it impinges on a dealer's ability to exercise its statutory reimbursement options.  They explain that the statutory compensation rates for parts and labor under the Act are subject to different reimbursement methodologies, *see* 63 P.S. §818.9(a)(2), (3), which they believe reveals that the two compensation rates are independent options.  From this, Dealers reason:

> A statutory option is simply not available if a dealer loses something by accessing that option.  And because the General Assembly mandated that the statutory reimbursement options be available to dealers, GM has violated the Act by conditioning access on the non-exercise of a statutory right.
>
> . . . [T]he contractual and statutory reimbursement options must be independent of one another and must each be available with no strings attached.  By attaching a string to the statutory parts reimbursement option, GM violated the unambiguous words of the statute.

Brief for Appellants at 25; *see also id.* at 30-31.

In the event that Section 9(a) is deemed ambiguous in the relevant regards, Dealers invoke multiple factors articulated in the Statutory Construction Act, including assessment of the occasion and necessity for the statute, the object to be attained, the mischief to be remedied, and the consequences of a particular interpretation. *See* 1 Pa.C.S. §1921(c)(1), (3), (4), (6). In these regards, Dealers stress the legislative purpose to protect dealers from unfair treatment by vehicle manufacturers. *See* Brief for Appellants at 29 (citing Honorable Robert Tomlinson, *Senate Co-Sponsorship Memorandum for SB 732* (Mar. 4, 2013)); *accord Van Wie Chevrolet, Inc. v. General Motors, LLC*, 38 N.Y.S.3d 662, 666 (N.Y. App. Div. 2016) (discussing a New York statutory regime with attributes similar to the Act). According to Dealers, they lack equality in bargaining power with General Motors, since for example, "[r]ather than contractual reimbursement rates being established through schedules negotiated individually between GM and *each* dealer, they are established through a standard, copyrighted [SPPM] generated by GM." *Id.* at 31. Dealers thus assert that their construction of the Act is supported by the fact that the General Assembly enacted the statutory retail rate options in Section 9(a) to afford dealers additional protections against abuses by manufacturers. They find the Commonwealth Court's treatment to be contrary to this salutary aim. Dealers also cite *Generette v. Donegal Mutual Insurance Company*, 598 Pa. 505, 957 A.2d 1180 (2008), for the proposition that contracts against public policy cannot be enforced. *See id.* at 522, 957 A.2d at 1191.

Upon review, we credit the Commonwealth Court majority's analysis and holding on the Option C issue on their terms. As General Motors persuasively argues, although the Act plainly modifies its contractual relationship with Dealers, nothing in the enactment precludes the company from enforcing a preexisting, contractual, incentive-based program, offering *more favorable* labor reimbursement rates than are available

under the Act only to those dealers who will accept the company's standard parts reimbursement protocol. And nothing in the contract, beyond a monetary incentive to voluntarily refrain from invoking the statutory reimbursement methodology, interferes with Dealers' ability to access the full panoply of benefits made available under the Act. *Accord* Brief for Appellee at 44 ("[T]he Option C eligibility language presents no conflict with dealers' ability to receive statutory reimbursement for warranty parts and labor.").[6]

We realize that the Act embodies remedial legislation designed to protect Pennsylvania dealers from unfair practices on the part of vehicle manufacturers, amidst business relationships with perceived bargaining disparities. Accordingly, the principle of statutory construction favoring a broad construction of remedial legislation militates in Dealers' favor. *See* 1 Pa.C.S. §1928(c). Yet, in the context of statutes altering contractual agreements between vehicle manufacturers and dealers, courts have been particularly circumspect and careful not to exceed the express prescriptions of the governing statute. *See, e.g.*, *General Motors Corp. v. Darling's*, 444 F.3d 98, 109 (1st Cir. 2006) ("Absent a clear mandate from the legislature, we are disinclined to unnecessarily interfere with the bargains that have been struck between the manufacturers and their distributors." (citation omitted)).[7]

---

[6] In this regard, we respectfully differ with Justice Mundy's position that Section 9(a)'s requirements for retail-rate reimbursement constitute statutory authority mandating General Motors to do something else (*i.e.*, maintain the contractual Option C rate for labor reimbursement, despite Dealers' non-observance of the contractual prerequisite). *See* Concurring and Dissenting Opinion. *slip op.* at 3. Responsively, we reiterate that Section 9(a) simply does not provide for Option C reimbursement.

[7] The *Darling's* court cited the principle that "statutes in derogation of a natural or common right, including statutes that 'threaten [] to invade an existing property or contract right' must be narrowly interpreted." *Id.* (quoting NORMAN J. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION §61:6 (6th ed. 2000)). In Pennsylvania, however, the straightforward application of the analogous principle is constrained to statutes predating September 1, 1937. *See* 1 Pa.C.S. §1928(b)(8). (continued…)

In terms of judicial deference to the Board's construction of the Act, Dealers cite *Alpha Auto Sales, Inc. v. Dep't of State, Bureau of Prof'l & Occupational Affairs*, 537 Pa. 353, 644 A.2d 153 (1994), for the proposition that "great deference" is due to the Board. *Id.* at 357, 644 A.2d at 155 (quoting *Mormak v. UCBR,* 135 Pa. Cmwlth. 232, 237, 579 A.2d 1383, 1385-86 (1990)). This Court has also indicated, however, that the principle of deference applies with greater force to longstanding agency interpretations, only when the language of a statute is ambiguous, and only within the range of agency authority and expertise. *See, e.g.*, *Nationwide Ins. Co. v. Schneider*, 599 Pa. 131, 145, 960 A.2d 442, 450 (2008) (citing *Popowsky v. PUC*, 594 Pa. 583, 606, 937 A.2d 1040, 1054 (2007)); *Estate of Loeb,* 400 Pa. 368, 373, 162 A.2d 207, 211 (1960). In all events, this Court has maintained its role as the final arbiter in matters of statutory

(…continued)

Nevertheless, at least if taken too far, an intrusion upon otherwise vested interests will implicate constitutional interests, and thus, it is clear that the Legislature would have proceeded with its own circumspection in balancing the important *respective* rights and interests involved in manufacturer-dealer business relationships. Accordingly, and in light of the fact that the Act purports only to establish an alternative scheme of remuneration available to dealers at their own discretion, we conclude that the principle that remedial statutes are to be liberally construed does not operate to effectively strip an otherwise discretionary, contract-based incentive program of the material condition on which it is premised.

Although, as Justice Mundy notes, *Darling* was a federal diversity case, the federal circuit court plainly expressed *its own* disinclination to unnecessarily interfere with commercial contracts in the absence of a clear legislative mandate. *See Darling*, 444 F.3d at 109. And certainly the decision would have no less persuasive force had this sentiment derived from the Supreme Judicial Court of Maine. As to the assertion, in the concurring and dissenting opinion, that *Darling* was based on legislative silence whereas the present case involves requirements expressly articulated by the Pennsylvania General Assembly, *see* Concurring and Dissenting Opinion, *slip op.* at 3, we have repeatedly observed that such requirements simply do not pertain to the availability of contractual incentives above and beyond the statutorily-prescribed retail rates. In other words, both scenarios (*Darling* and the present case) involve legislative silence in the relevant respects.

construction. *See, e.g.*, *Colville v. Allegheny Cty. Ret. Bd.*, 592 Pa. 433, 443 n.4, 926 A.2d 424, 430 n.4 (2007).[8]

Here, we agree with Dealers that the question presented ultimately devolves to whether the contractual condition attending a dealer's eligibility for Option C reimbursement is void as against a public policy deriving from the Act. However, while certainly General Motors bears the burden, under the Act, "to prove it has not violated any provision of this act," 63 P.S. §818.9, we conclude that this allocation does not extend to a public-policy-based challenge to enforcement of a contractual provision. Indeed, arguably at least, such a challenge would more appropriately have been presented in a declaratory judgment proceeding lodged in a court of law. *See, e.g.*, *Generette*, 598 Pa. at 510, 957 A.2d at 1183. But, in any event, there is no evidence in the Board's decision that it applied any particular expertise on the legal question presented, and moreover, aspects of its reasoning are infirm. *See supra* notes 4 & 5. Furthermore, the Board's construction of the Act is not a longstanding one. In these, circumstances, and in light of our analysis above, whatever deference is due to the

---

[8] The concurring and dissenting opinion posits that this Court should broadly undertake here to resolve whether the conferral of deference to administrative tribunals "is still cogent in Pennsylvania." Concurring and Dissenting Opinion, *slip op.* at 4. No party to this appeal, however, has suggested that we should engage in a wholesale reconsideration of the array of principles governing judicial deference in the administrative setting. Instead, General Motors' argument favoring less deference is premised on the circumstances at hand -- "where the questions presented are purely legal ones, the case was presented on stipulated facts, and the Board possessed no specialized expertise superior to that of the Commonwealth Court in reading the plain language of a non-technical statute on issues of first impression." Brief for Appellee at 24. Our present treatment conforms to the arguments presented.

Board's construction is surpassed by the weight of our independent legal analysis pertaining to the Option C issue and Section 9(a) of the Act.[9]

In summary, we agree with the Commonwealth Court and General Motors that the Act does not create a statutory right for Dealers to participate in the Option C program, either by virtue of its plain terms or by implication.

## II. Section 9(b.4) and Surcharge

Relative to the interpretation of Section 9(b.4), Dealers criticize the Commonwealth Court for construing the conjunctive phrase "parts *and* labor" as disjunctive, *i.e.,* "either parts *or* labor." According to Dealers, this approach undermines the Act's purpose to protect local Pennsylvania dealers. It is Dealers' position that the "parts and labor" can also be read to mean just that in the reversionary clause of Section 9(b.4), without creating any material incongruity.

General Motors, on the other hand, maintains that the Legislature intended for manufacturers to be able to recoup their costs for warranty repairs, and that the Commonwealth Court properly construed the plain language of Section 9(b.4)(1)(i) to conclude that General Motors was entitled to recover its increased costs from dealers that opt out of the safe harbor by seeking statutory retail reimbursement for warranty parts. Reading this subsection in conjunction with the reversionary provision in subsection (b.4)(2), the company contends, its approach represents the only reasonable interpretation of the phrase "parts and labor."

---

[9] General Motors notes as an aside that the Board is disproportionately composed of dealer representatives, and indeed, there is no representative of any manufacturer on the Board. *See* Brief for Appellee at 3 n.1 (citing 63 P.S. §818.3(a)). To the degree there is any appearance that members of the Board may have a direct or indirect financial interest in the outcome of a case, this circumstance obviously makes the affordance of deference less comfortable for a neutral judiciary.

As related by a prominent commentator, "[t]he terms 'and' and 'or' are often misused in statutes." NORMAN SINGER, 1A SUTHERLAND STATUTORY CONSTRUCTION §21:14 (7th ed. 2018). But, by this point in time at least, the Legislature should be no less aware of the problem than we are, and accordingly, in the absence of a result that is unreasonable, absurd, or incapable of execution, this Court has generally taken "and" to mean "and" and "or" to mean "or." *See, e.g.*, *Garratt v. City of Phila.*, 387 Pa. 442, 445-46, 127 A.2d 738, 740 (1956).[10] *See generally* HON. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 117 (2012) (explaining that, ordinarily, the conjunction "and" "entails an express or implied *both* before the first element." (emphasis in original)). Thus, in the context of Section 9(b.4)(1)(i), we read the phrase "parts and labor" to mean both parts *and* labor, and we credit Dealers' argument that a manufacturer cannot impose a surcharge on a dealer that does not apply for retail-rate reimbursement for both. *See* 63 P.S. §818.9(b.4)(1)(i).

In terms of Section 9(b.4)(2)'s reversionary clause, we also agree with Dealers that the treatment of "parts and labor" in that section to mean *both* parts *and* labor does not create a result that is absurd, unreasonable, or incapable of execution. From our point of view, the Act appears to be somewhat of a blunt instrument in its protective provisions, since, for example, it does not require an inquiry into the impact of the statutory calculation of reimbursement rates and regulation cost recovery on manufacturers' or dealers' profit margins. The statute also does not require any

---

[10] For a contrary view reflecting a more flexible approach to the interchangeability of "and" and "or," see, for example, *R.A. Peacock v. Lubbock Compress Company*, 252 F.2d 892, 893-95 (5th Cir. 1958).

assessment of the impact of any vehicle pricing adjustments that may result from a manufacturer's inability to impose surcharges on competitiveness or profitability.[11]

Nevertheless, in response to General Motors' arguments about economic sensibility, we observe that "[t]he vast majority of states regulate the price of warranty reimbursement payments to automobile dealers, and over a dozen states have enacted . . . recoupment prohibitions." *Alliance of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 56 (D. Conn. 2013). Furthermore, neither the Legislature nor the parties in their stipulation have probed the economics in any fashion beyond the employment of abstract terms, and therefore, we have little means of making a concrete, independent assessment at this time.[12] And, in such a landscape, we are unable to brand the General Assembly's decision to tie both the availability of a surcharge and reversion to dealer choices relative to both parts and labor to be unreasonable, absurd, or incapable of execution.

The order of the Commonwealth Court is affirmed as it relates to Section 9(a) and reversed as concerns Section 9(b.4)(1)(i).[13]

---

[11] Section 9(b.4)(1)(ii) allows that "[a] manufacturer or distributor may increase the price for a vehicle or part in the normal course of business." 63 P.S. §818.9(b.4)(1)(ii).

[12] Of course, the General Assembly very well may have considered information about profitability and competition in the legislative process giving rise to the 2013 amendments to the Act.

[13] By Order, dated November 15, 2018, Appellant Mel Grata Chevrolet, Inc. was dismissed from the present proceedings, and our present Order should be read accordingly.

Justices Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy files a concurring and dissenting opinion.

Justice Baer did not participate in the consideration or decision of this case.